UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NOAH SCHRODER,<br><br>                    Plaintiff,<br><br>     v.<br><br>CHRIS JOHNSON; RONA SIEGERT; and P.A. REECE,<br><br>                    Defendants. | Case No. 1:21-cv-00106-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Plaintiff, a prisoner in the custody of the Idaho Department of Correction ("IDOC"), is proceeding pro se and in forma pauperis in this civil rights matter. Plaintiff claims that, from May through November 2020, Defendants failed to provide him with adequate medical treatment for a torn Achilles tendon. Plaintiff alleges that he suffered chronic pain and is now handicapped as a result. *See generally Amended Complaint* ("Am. Compl."), Dkt. 7.

Plaintiff sues Anthony Reece, a Family Nurse Practitioner formerly with Corizon—the private entity that, at all relevant times, provided Idaho inmates with medical care under contract with the IDOC. Plaintiff also names as Defendants Chris Johnson, a Health Services Administrator; and Rona Siegert, the IDOC's Health Services Director.

MEMORANDUM DECISION AND ORDER - 1

Plaintiff has been allowed to proceed on Eighth Amendment claims under 42 U.S.C. § 1983, as well as claims of negligence or medical malpractice under Idaho state law. All other claims against all other Defendants have been dismissed. *See Successive Review Order*, Dkt. 8, at 6.

Defendants have filed a Motion for Summary Judgment. Defendants argue that Plaintiff's treatment was medically appropriate and that, therefore, they are entitled to judgment as a matter of law on all of Plaintiff's claims. *See generally Memo. in Supp. of Defendants' Motion for Summary Judgment* ("Defs' Memo. in Supp."), Dkt. 23.

The parties have filed responsive briefing, and the motion is ripe for the Court's consideration.[1] Having carefully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. *See* D. Idaho Loc. Civ. R. 7.1(d). Accordingly, and for the reasons that follow, the Court will grant Defendants' Motion for Summary Judgment and dismiss this case with prejudice.

## 1.     Standard of Law Governing Summary Judgment

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the

---

[1] Defendants argue that the Court should not consider Plaintiff's responsive briefing because it was not timely filed. Mindful of Plaintiff's pro se status, the Court will exercise its discretion to consider Plaintiff's briefing.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of
the principal purposes of the summary judgment rule "is to isolate and dispose of
factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317,
323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the
"principal tool[] by which factually insufficient claims or defenses [can] be
isolated and prevented from going to trial with the attendant unwarranted
consumption of public and private resources." *Id*. at 327.

In resolving a summary judgment motion, the Court must consider the facts
in the light most favorable to the non-moving party, unless the non-moving party's
version of the facts is "blatantly contradicted by the record[] so that no reasonable
jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If such a blatant
contradiction exists, then there is no "genuine" dispute as to that fact. *Id*.

The moving party bears the initial burden to show that each material fact
cannot be disputed. Material facts are those "that might affect the outcome of the
suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Disputes over
irrelevant or unnecessary facts will not preclude a grant of summary judgment."
*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.
1987).

To show that the material facts are not in dispute, the moving party may cite
to particular parts of materials in the record or show that the adverse party is

unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment ...." *Anderson*, 477 U.S. at 247–48. Rather, a case will survive summary judgment only if there is a *genuine* dispute as to a *material* fact.

If the moving party meets this initial responsibility, the burden then shifts to the non-moving party to establish that a genuine dispute as to any material fact does indeed exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Instead, "there must be evidence on which [a] jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific, triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

That is, "if a defendant moving for summary judgment has produced enough evidence to require the plaintiff to go beyond his or her pleadings, the plaintiff must counter by producing evidence of his or her own." *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004). If the plaintiff fails to produce evidence, or if the evidence produced is insufficient, the Court "is not required (or even allowed) to assume the truth of the challenged allegations in the complaint." *Id.*

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court must grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Where, as here, the party moving for summary judgment would not bear the burden of proof at trial, that party may prevail simply by "pointing out to the district court[] that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.

Statements in a brief, unsupported by the record, cannot be used to create a dispute of fact. *Barnes v. Indep. Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995). Affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is

competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In determining

admissibility for summary judgment purposes, it is the content of the evidence,

rather than its form, that must be considered. *Fraser v. Goodale*, 342 F.3d 1032,

1036-37 (9th Cir. 2003).

The Court does not determine the credibility of affiants or weigh the

evidence set forth by the parties. Although all reasonable inferences which can be

drawn from the evidence must be drawn in the light most favorable to the non-

moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630–31, the Court is not required

to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*,

849 F.2d 1205, 1208 (9th Cir. 1988).

In cases involving pro se inmates, courts liberally construe the pleadings and

briefs and "should avoid applying summary judgment rules strictly." *Thomas v.

Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). However, although pro se inmates

are exempted "from *strict* compliance with the summary judgment rules," they are

not exempted "from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th

Cir. 2018). In opposing a motion for summary judgment, a pro se inmate must

submit at least "some competent evidence," such as a "declaration, affidavit, [or]

authenticated document," to support his allegations or to dispute the moving

party's allegations. *Id.* at 873 (upholding grant of summary judgment against pro

se inmate because the "only statements supporting [plaintiff's] ... argument are in

MEMORANDUM DECISION AND ORDER - 6

his unsworn district court responses to the defendants' motion for summary

judgment and to the district court's show-cause order").

## 2.    Factual Background

This section includes facts that are undisputed and material to the resolution

of the issues in this case. Where material facts are in dispute, the Court has

included Plaintiff's version of facts, insofar as that version is not blatantly

contradicted by clear documentary evidence in the record. *See Scott*, 550 U.S. at

380. Although Plaintiff's medical treatment from May to November 2020 is the

only period of treatment at issue in this case, a more thorough history of Plaintiff's

Achilles tendon injury is helpful in understanding Plaintiff's entire course of

treatment for that injury.

Plaintiff injured his Achilles tendon in January 2020, when he was being

held at the Ada County Jail. *Declaration of Chris Johnson* ("Johnson Decl."), *Ex.

A*, Dkt. 23-4, and *Ex. C*, Dkt. 23-8. Medical personnel examining Plaintiff found

no masses or swelling, but Plaintiff was in severe pain. He was treated with ice,

warm packs, and ibuprofen and was told to elevate his foot. *Declaration of

Anthony Reece* ("Reece Decl."), Dkt. 23-9, ¶ 8. When this failed to bring relief, jail

medical staff increased Plaintiff's ibuprofen, ordered a compression sock, and

limited Plaintiff's lower body exercise for two weeks. *Id*., ¶ 9.

Plaintiff continued to suffer pain and was evaluated by jail medical staff on February 11, 2020. Plaintiff was diagnosed with an "Achilles tendon strain." Even though there were no obvious deformities or swelling and the tendon appeared to be intact, medical staff added stretches to the treatment plan. *Id.*, ¶ 10.

On February 13, 2020, Plaintiff was transferred from county to IDOC custody and transported to the Idaho State Correctional Institution ("ISCI"). *Id.*, ¶ 11. A week later, Plaintiff was examined by ISCI Physician's Assistant Anthony Bushnell. Plaintiff informed Bushnell about the ankle injury and stated that he believed he had reinjured it a few days earlier. *Reece Decl.*, ¶ 13. PA Bushnell reported that Plaintiff could be suffering from "an osseous injury and/or significant tendon and/or joint injury." *Id.* Bushnell prescribed ibuprofen and Tylenol and ordered an x-ray. Bushnell believed that Plaintiff may have ruptured his Achilles tendon. *Id.* Bushnell also prescribed crutches, a wheelchair, and a lower bunk.

Plaintiff was given the x-ray the next day. *Id.*, ¶¶ 13–14. It revealed some thickening of the Achilles tendon.

Plaintiff had a follow-up appointment with Bushnell on February 26, 2020. Based on that examination and the x-ray results, Bushnell initially referred Plaintiff for an MRI "to fully evaluate the soft tissue of his left ankle." *Reece Decl.*, ¶ 15. However, a few days later, Bushnell recommended an ultrasound instead, given

that the "typical progress of medical imaging in an x-ray, following by an ultrasound, followed by an MRI if indicated." *Id.*, n.1.

The ultrasound was performed on March 11, 2020. The reviewing radiologist concluded Plaintiff might have a partial tear in his Achilles tendon. *Id.*, ¶ 16. Surgery was not indicated at that time because it was not a complete tear and because it "was in the process of healing." *Id.*, ¶ 15, n.1.

Plaintiff's next appointment was with NP Rogers on April 7, 2020. Rogers referred Plaintiff to physical therapy and determined that "medical necessity [was] not demonstrated at [that] time." *Id.*, ¶ 18. Rogers concluded that conservative pain treatment measures should be taken pending the physical therapy consultation and noted that a follow-up with medical staff would be appropriate if the injury did not improve with physical therapy. *Id.*

NP Rogers again examined Plaintiff on April 21, 2020. Plaintiff reported that he was feeling better but that he was still having trouble. Plaintiff told NP Rogers that the physical therapist had given him strength exercises to practice and that "it could take eight to twelve months for his Achilles to heal." *Id.*, ¶ 19. NP Rogers approved insoles or arch supports for Plaintiff's shoes.

Plaintiff was transferred to another prison, the Idaho State Correctional Center ("ISCC") at the end of April. He received a bottom bunk memo and a physical therapy renewal, but he was still complaining of pain and told medical

staff that the ibuprofen and Tylenol were not helping. Plaintiff received physical therapy only a few days later. Additionally, another medical provider ordered a new x-ray of Plaintiff's ankle, which was performed on May 5, 2020. *Id*., ¶¶ 20–23.

On May 16, 2020, the physical therapist put Plaintiff's treatment on hold until Plaintiff could be seen by a medical provider. *Johnson Decl., Ex. A*, Corizon_Schroder 000034–35. That follow-up appointment occurred on June 17, 2020, when Plaintiff was evaluated by Defendant NP Reece.[2]

At the June 17 appointment, Reece compared the more recent x-ray to the previous x-ray and saw worsening swelling and "significant soft tissue density." *Reece Decl*., ¶ 25. Reece ordered another ultrasound and noted that Plaintiff's x-ray revealed "no acute bony abnormality." Reece also prescribed ibuprofen, Methocarbonal (a muscle relaxant), and physical therapy "as deemed appropriate by the physical therapist." *Id*.

Plaintiff filed a grievance about his medical care on June 11, 2020—before he saw NP Reece on June 17—to which Defendant Chris Johnson responded. Johnson reviewed Plaintiff's medical records and noted that Plaintiff had indeed been evaluated by NP Reece on June 17. As Johnson informed Plaintiff, Reece and

---

[2] Though Plaintiff alleges that he saw Defendant NP Reece on May 1, 2020, *Am. Compl*. at 7, Plaintiff's medical records confirm the date of the appointment with Reece as June 17, 2020. *See Reece Decl*., ¶ 25.

Plaintiff had agreed to a treatment plan at that appointment. *Johnson Decl., Ex. B*. Plaintiff's own allegations support Johnson's statement about the treatment plan— Plaintiff acknowledges that he and Reece discussed ultrasound and physical therapy, and, if necessary, potential surgery. *Am. Compl*. at 7.

Plaintiff sought review of the grievance response, claiming that the treatment plan developed by NP Reece was not being followed. Defendant Siegert, the appellate authority, responded that the new ultrasound ordered by NP Reese was, in fact, scheduled to occur. Siegert also told Plaintiff she "asked medical to get [Plaintiff] scheduled with physical therapy while [he] wait[ed] for the ultrasound." *Johnson Decl., Ex. B*.

A licensed practical nurse saw Plaintiff on June 23, 2020, and scheduled another follow-up appointment with NP Reece in August. Plaintiff was seen for a routine appointment in the meantime, however, and his Methocarbonal was renewed on July 17, 2020. *Reece Decl*., ¶¶ 26–27.

Plaintiff's follow-up with NP Reece occurred on August 12, 2020. Plaintiff told Reece that "his current pain medications were not helping"; Plaintiff also reported that the isolation and lack of mobility necessitated by COVID-19 outbreaks caused him lower back pain as well. *Id*., ¶ 29. Reece decided to change Plaintiff's medication, switching him from Methocarbonal to Gabapentin, which is used to treat nerve pain. Reece scheduled Plaintiff for physical therapy and noted

that Plaintiff's ultrasound—the one previously ordered by Reece—was scheduled for the following day.

Reece explained to Plaintiff that "minor to moderate Achilles tendon injuries should heal on their own" but that "they can take months depending on the severity of the injury, even up to a year." *Id*. Reece instructed Plaintiff "on various stretches and strengthening exercises he could perform on his own" and "stressed the importance of continuing strength and stability training to promote healing." *Id*.

Plaintiff received the ultrasound on August 13. It showed that, although the tendon was still swollen, "the fluid collection previously seen has resolved and features have improved." *Id*., ¶ 30. Reece explains this finding: Plaintiff's partial Achilles tear "was in the process of healing." Therefore, according to Reece, "continuing conservative care, including therapy and medication, was appropriate." *Id*.

Plaintiff's next appointment with the physical therapist occurred ten days later. The physical therapist noted improvement in Plaintiff's ankle, finding no serious swelling, redness, or bruising. Based on these findings and the August 13 ultrasound results, Plaintiff's Achilles tendon "appear[ed] to be healing." *Id*., ¶ 32.

This healing appears to have continued, because the records from Plaintiff's next physical therapy session, on August 29, 2020, noted that Plaintiff was "feeling better" and had "no complaints." Through his next two physical therapy sessions,

Plaintiff was "educated to perform additional exercises and strengthening," and the tendon continued to improve through September 2020. *Id*., ¶¶ 33–34. Plaintiff's physical therapist recommended continued physical therapy.

Though the injury was getting better, it was taking some time. Plaintiff was again informed that healing from an Achilles tendon injury is a "slow recovery." *Id*., ¶ 36. Plaintiff received a renewal of his Gabapentin prescription on September 16, 2020. *Id*., ¶ 35.

In October 2020, Plaintiff continued to feel back pain in addition to his ankle injury. At an October 3 physical therapy session, Plaintiff "attributed his back pain to spending the majority of his time in his cell due to COVID lockdowns." He was instructed to "continue both physical therapy and the home exercise plan." *Id*., ¶¶ 36–37. Plaintiff was scheduled for a follow-up appointment with NP Reece.

Unfortunately, as the physical therapist noted at Plaintiff's next session, the healing of the tendon had regressed. Plaintiff also was still experiencing back pain when he saw NP Reece at an October 14 medical appointment. Reece ordered physical therapy for Plaintiff's back and ordered an x-ray. Less than two weeks later, Reece renewed Plaintiff's Methocarbamol and again ordered continued physical therapy. At Plaintiff's next two therapy appointments, in October and November, Plaintiff's back pain was the primary injury addressed. On November 7, 2020, Plaintiff reported that he felt no back pain. *Id*., ¶¶ 38–40.

MEMORANDUM DECISION AND ORDER - 13

However, Plaintiff soon complained of back pain again. NP Reece examined

Plaintiff and noted that Plaintiff was unhappy that he had not seen a doctor in two

weeks, even though Plaintiff was still having physical therapy through this time.

*Reece Decl*., ¶ 41. Plaintiff continued physical therapy throughout November, and

his pain medication was renewed as well.

The medical records do not show that Plaintiff complained about the tendon

injury after October 2020. The records also show that Plaintiff had stopped

complaining about back pain by January 21, 2021. *Id*., ¶ 42.

**3.    Discussion**

For the following reasons, the Court concludes that Defendants are entitled

to summary judgment.

### A.    *Standards of Law Applicable to Plaintiff's Claims*

Plaintiff brings claims under 42 U.S.C. § 1983, the federal civil rights

statute. To state a plausible civil rights claim, a plaintiff must allege a violation of

rights protected by the Constitution or created by federal statute proximately

caused by conduct of a person acting under color of state law. *Crumpton v. Gates*,

947 F.2d 1418, 1420 (9th Cir. 1991).

Prison officials and prison medical providers generally are not liable for

damages in their individual capacities under § 1983 unless they personally

participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040,

MEMORANDUM DECISION AND ORDER - 14

1045 (9th Cir. 1989); *see also Iqbal*, 556 U.S. at 677 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). Section 1983 does not allow for recovery against an employer or principal simply because an employee or agent committed misconduct. *Taylor*, 880 F.2d at 1045.

Plaintiff asserts claims under the Eighth Amendment to the United States Constitution, which protects prisoners against cruel and unusual punishment and guarantees prisoners the right to minimally adequate conditions of confinement. To state a claim under the Eighth Amendment, prisoners must plausibly allege that they are "incarcerated under conditions posing a substantial risk of serious harm," or that they have been deprived of "the minimal civilized measure of life's necessities" as a result of the defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires the plaintiff to satisfy both (1) an objective standard, "that the deprivation was serious enough to constitute cruel and unusual punishment," and (2) a subjective standard, that the defendant acted with "deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

The Eighth Amendment includes the right to adequate medical treatment in prison. Prison officials or prison medical providers can be held liable if their "acts

or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Regarding the objective standard for prisoners' medical care claims, "society does not expect that prisoners will have unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Therefore, "deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id*. The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] ... [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain ....

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

As to the subjective standard, "deliberate indifference entails something more than mere negligence, [but it] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. A prison official or prison medical provider acts with deliberate indifference "only if the [prison official or provider] knows of and

MEMORANDUM DECISION AND ORDER - 16

disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (internal quotation marks omitted), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837).

In the medical context, deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05 (footnotes omitted). Medical malpractice or negligence does not support a cause of action under § 1983, *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam), and a delay in medical treatment does not violate the Eighth Amendment unless that delay causes further harm, *McGuckin*, 974 F.2d at 1060. Additionally, there is no constitutional right to an outside medical provider of one's own choice. *See Roberts v. Spalding,* 783 F.2d 867, 870 (9th Cir. 1986) ("A prison inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution.").

"If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188. Moreover, even prison officials or medical providers who *did* know of a substantial risk to an inmate's health will not be liable under § 1983 "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. If medical personnel have been "consistently responsive to [the inmate's] medical needs," and the plaintiff has not shown that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," there has been no Eighth Amendment violation. *Toguchi*, 391 F.3d at 1061.

"There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (internal quotation marks omitted). Accordingly, mere differences in judgment as to appropriate medical diagnosis and treatment between an inmate and prison medical providers—or, for that matter, between medical providers—are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

"[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of

an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). Stated another way, a plaintiff must prove that medical providers chose one treatment over the plaintiff's preferred treatment "even though they knew [the plaintiff's preferred treatment] to be medically necessary based on [the plaintiff's] records and prevailing medical standards." *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1117 (N.D. Cal. 2015). To violate the Eighth Amendment, the choice of treatment must have been "so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998); *see also Lamb v. Norwood*, 895 F.3d 756, 760 (10th Cir. 2018) ("[P]rison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants.").

In addition to § 1983 claims, Plaintiff also asserts state law claims of negligence or medical malpractice. The elements of a negligence claim under Idaho law are "(1) a duty, recognized by law, requiring a defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage." *McDevitt v. Sportsman's Warehouse, Inc.*, 255 P.3d 1166, 1169 (Idaho 2011). A person breaches a duty, and thus commits negligence, when that person

acts in a manner in which a reasonable person would not. *See Steed v. Grand Teton Council of the Boy Scouts of Am., Inc.*, 172 P.3d 1123, 1128–29 and n.3 (Idaho 2007) (describing the reasonable person standard as the "negligence standard of care").

Additionally, to succeed on a medical malpractice claim, the plaintiff must affirmatively "prove by direct expert testimony and by a preponderance of all the competent evidence" that the defendant medical provider "negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided." Idaho Code § 6-1012.

### B.   *Defendants Are Entitled to Judgment as a Matter of Law*

As explained below, Defendants have submitted sufficient evidence that the medical treatment Plaintiff received for his torn Achilles tendon and pain was consistent with the applicable standard of care for such injuries. Nurse Practitioner Reece, a qualified medical expert in family practice medicine, describes the community standard of care as follows:

> Treatment of a partial tear of an Achilles tendon is individualized based on each patient's condition. However, the general progression of treatment for a partial tear of an Achilles includes immobilization of the ankle area for the first few weeks (e.g., boot, wheelchair and/or crutches), pain medication and/or muscle relaxers, and medical imaging when indicated. Once the tendon has started healing, physical therapy for the ankle is usually recommended.

MEMORANDUM DECISION AND ORDER - 20

*Reece Decl.*, ¶ 43.[3] Between the treatment provided to Plaintiff when he was at the Ada County Jail (which is not the subject of this action) and the treatment provided by Defendants when Plaintiff was in IDOC custody, Plaintiff received all these types of treatment.

Achilles tendon tears are quite serious injuries. "It can take a long time to rehabilitate an Achilles tear[,] and strict compliance with the recommended physical therapy can improve the healing time." *Id*. It is normal for such an injury to take many months, even a year, to fully heal. Plaintiff was informed of this fact multiple times throughout his treatment. Plaintiff's treatment included "pain medications, muscle relaxers, medical imaging via x-rays and ultrasounds, a bottom bunk memo, and … physical therapy." *Id*.

Multiple diagnostic tests confirmed that, over several months, Plaintiff's tendon was healing, and his back pain eventually improved. Plaintiff's injuries evidently had completely healed by late 2020 or early 2021 because, as the medical records show, Plaintiff had stopped complaining of pain.

Defendants have met their burden of establishing that Plaintiff's medical care was appropriate and that they were not deliberately indifferent to Plaintiff's serious medical needs. Therefore, for purposes of *both* Plaintiff's Eighth

---

[3] Contrary to Plaintiff's contention, *see Memo. in Opp*. at 6, NP Reece can indeed express an opinion regarding the medical treatment provided to Plaintiff before Reece began treating him. Because NP Reece's opinion meets the requirements of Federal Rule of Evidence 702, Reece may offer an expert opinion about that treatment.

Amendment claims and his Idaho state law negligence claims,[4] the burden now shifts to Plaintiff to show that a genuine dispute of material fact precludes a grant of summary judgment. Plaintiff has not done so.

Plaintiff primarily contends that, although he was indisputably "seen" by multiple providers throughout the time period at issue, he did not actually receive any medical care. *See Memo. in Opp. of Defendants' Motion for Summary Judgment* ("Pl's Memo. in Opp."), Dkt. 28, at 4. Plaintiff's medical records conclusively refute this contention.

Throughout the treatment period at issue, Plaintiff received multiple pain medications, physical therapy, and numerous diagnostic tests, as well as exercises he was instructed to perform in his cell. Though Plaintiff alleges that such exercise was impossible because he had a cellmate, *see id*. at 5, there is no evidence in the record that having a cellmate prohibited Plaintiff from doing the prescribed exercises to help with his tendon injury.

Plaintiff also complains of an 89-day delay between the date when a provider recommended the repeat ultrasound and the date the ultrasound was

---

[4] Treatment that is medically appropriate and consistent with the generally applicable standard of care in the community satisfies the Eighth Amendment. *See Farmer*, 511 U.S. at 844 ("[P]rison officials [or prison medical providers] may not be held liable … if they responded reasonably to a known risk …."). Similarly, such treatment is not negligent under state law. *See* Idaho Code § 6-1012 ("[A] plaintiff [asserting a medical malpractice claim] must, as an essential part of his or her case in chief, affirmatively prove … that [the] defendant … failed to meet the applicable standard of health care practice of the community.").

performed. *Memo. in Opp.* at 5. However, this is not dissimilar to periods of delay experienced by patients outside of prison. Plaintiff was still receiving medication during this time and has not shown that he was prohibited from exercising in his cell. Further, Plaintiff received physical therapy once the COVID lockdown was lifted.

All of the evidence in the record reveals that Plaintiff's medical providers were "consistently responsive" to Plaintiff's medical needs and provided medically appropriate treatment. *Toguchi*, 391 F.3d at 1061. Therefore, Defendants are entitled to judgment as a matter of law, and the Motion for Summary Judgment must be granted.

## CONCLUSION

For the foregoing reasons, the Court concludes that Defendants are entitled to summary judgment on all of Plaintiff's claims.

## ORDER

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Dkt. 23) is GRANTED, and this case is DISMISSED with prejudice.

DATED: January 4, 2023

B. Lynn Winmill
U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 23